**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KATHLEEN A. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 7055 |
| v. | ) | |
| | ) | **Magistrate Judge** |
| CAROLYN W. COLVIN,[1] | ) | **Jeffrey T. Gilbert** |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Kathleen A. Smith ("Claimant") brings this action under 42 U.S.C. § 405(g)

seeking reversal or remand of the decision of Respondent Carolyn W. Colvin, Acting

Commissioner of Social Security ("Commissioner"), denying her application for disability

insurance benefits under Title II and supplemental security income under Title XVI of the Social

Security Act. The parties have consented to the jurisdiction of a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 for all proceedings, including entry of final

judgment. ECF No. 20.

This matter is before the Court on the parties' cross-motions for summary judgment.

ECF Nos. 12, 16. Claimant argues that the decision of the Administrative Law Judge ("ALJ")

denying her application for disability benefits should be reversed or, alternatively, should be

vacated and this case should be remanded to the Social Security Administration ("SSA") for

further proceedings. For the reasons discussed herein, Claimant's motion for summary judgment

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin automatically is substituted as the Defendant in the case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(ECF No. 12) is denied. The Commissioner's motion for summary judgment (ECF No. 16) is granted, and the decision of the Commissioner is affirmed.

# I. BACKGROUND

## A.    Procedural History

Claimant filed an application for disability insurance benefits and supplemental security income on July 13, 2010, alleging a disability onset date beginning May 1, 2008. R. 21. The SSA initially denied the application on November 23, 2010, and upon reconsideration on April 15, 2011. *Id.* Claimant filed a timely request for an administrative hearing on May 17, 2011, which was held before an ALJ on May 2, 2012. *Id.* Claimant appeared and testified at the hearing, and was represented by counsel. *Id.* Dr. Ashok G. Jilhewar, a medical expert, and Lee Knutson, a vocational expert, also appeared and testified at the hearing. *Id.*

## B.    Hearing Testimony

### 1.    Claimant Kathleen A. Smith

Claimant was 46 years old at the time of the hearing. R. 45. She has a high school education. *Id.* She is single and has two teenage children, with whom she speaks daily and visits a few times per year. *Id.* at 71-72. Claimant lives with her boyfriend. *Id.* at 46. Claimant does not have a valid driver's license and has not driven for four years. *Id.* at 47.

Claimant testified that she has a congenital deformity in her left hand and had her second finger on her left hand removed when she was a child. *Id.* at 48. She testified that she has arthritis in her left pinky finger and left ring finger, and a pin in her thumb, which causes her thumb to frequently go numb. *Id.* at 49. Claimant testified that her hand goes numb and throbs at night and prevents her from sleeping. *Id.* She reported that she cannot use her left hand anymore and that she uses her right hand for household chores and grooming, but that she has

2

right shoulder and right hand pain due to overuse. *Id.* at 50-51. She previously worked as a housekeeper, but said the pain in her left hand and the arthritis in her right hand, which is "not really bad" but is "getting worse," prevent her from being able to do so anymore. *Id.* at 49. She reported that she had complained to her doctor about her right shoulder, but that she "can't always see [her] doctor, the regular physician, because [she has] to have money and [she doesn't] have money." *Id.* at 53-54. She said that she goes to the doctor "every few months so [she] can get [her] prescriptions because they do help" but that she "can't really afford it." *Id.* at 54.

Claimant testified that she has been diagnosed with bipolar disorder, post-traumatic stress disorder, anxiety, and ADHD. *Id.* Claimant has been a victim of abuse and also has a history of alcohol and drug use, but reports not having used cocaine or drinking alcohol since 2008. *Id.* at 54-55. Claimant reported racing thoughts and difficulty concentrating, though her medication helps calm her down. *Id.* at 56. She reported that if she tries to cook from a recipe she has to read it three or four times. *Id.* Her lack of concentration caused her to lose her job at a deli in 2010 after only a few days of work. *Id.* at 63-64. The pain in her hands has a negative impact on her concentration. *Id.* at 65.

Claimant testified that she sometimes feels as though people are staring at her left hand when she is in public and becomes bothered by that, but could not remember a time where that caused her to leave a place early. *Id.* at 59-60. She said that sometimes this feeling causes her to move to a different area. *Id.* When interacting with others, she is "moody" and tends to "snap" at people. *Id.* at 61. She does some socializing with friends and family, such as visiting them at home during the holidays, but she mostly stays in. *Id.* at 68-69.

Claimant reported occasional difficulties with sitting, and if she sits for more than an hour she gets anxious. *Id.* at 70. She also reported that standing bothers her, and that she can

only stand for about forty-five minutes. *Id.* She can walk about a mile. *Id.* She sometimes does laundry and goes to the grocery store about once a week. *Id.* at 59-60. She mops her house about once a week. *Id.* at 71. She reported that lifting more than a gallon would hurt her right shoulder. *Id.* at 69-70. Claimant carried a purse to the hearing. R. 53. She said that the pain prevented her from carrying the purse in her left hand or on her right shoulder, but that she can carry the purse on her left shoulder. *Id.*

Claimant testified that she takes Tramadol, Ativan, and Saphris. *Id.* at 68. Claimant reported taking Naproxen for the pain in her hands, but it was affecting her stomach, so she switched to Tramadol. *Id.* at 52. She testified that the Tramadol helped her hand pain, but she still experiences numbness in her hands. *Id.* Claimant reported that she was taking Concerta but stopped because it was affecting her heart, and that Ativan makes her dizzy and sleepy. *Id.* at 67.

### 2. Dr. Ashok Jilhewar, Medical Expert

Dr. Ashok Jilhewar, the medical expert, testified that he reviewed Claimant's medical records and did not see any abnormal findings in the right hand anywhere in the medical records since the alleged onset date of May 1, 2008. *Id.* at 73-74. Dr. Jilhewar testified that there was nothing in the medical records to explain Claimant's testimony of pain in the right hand. *Id.* at 74. Dr. Jilhewar found that Claimant's condition did not meet or equal a listed impairment. *Id.* 76. He agreed with the assessment of Dr. Charles Kenney, the DDS medical consultant, who opined Claimant was capable of light physical work, with minimal or no use of the left non-dominant hand. *Id.* 77. Dr. Jilhewar said that "practically she will be a so-called one handed individual." *Id.* Dr. Jilhewar did not place any limitations on the right upper extremity, as he found were no clinical findings in the medical records by any treating source or consultative

examiner with regard to the right shoulder. *Id.* He noted the paucity of medical records documenting Claimant's impairments may be due to Claimant's lack of insurance. *Id.* at 75.

### 3. Lee Knutson, Vocational Expert

Lee Knutson, the VE, testified that Claimant's work as a housekeeper was light and unskilled. *Id.* at 81. The ALJ's hypothetical question asked the VE to assume an individual of Claimant's age, education, and work experience who would be limited to light work with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; no use of the left non-dominant hand; no overhead reaching with the right upper extremity; and unskilled, simple, routine, and repetitive work that was not fast-paced in nature. *Id.* at 81-82. The VE testified that such an individual could work as a light unskilled receptionist or information clerk, and that there are around 4,700 of these jobs nationwide. *Id.* at 82. The VE further testified that such an individual also could work as an attendant in a self-service parking lot, and that there are between 250 to 500 of these jobs in the State of Illinois. *Id.*

### C. Medical Evidence

#### Claimant's Treating Physicians

#### 1. South Suburban Council on Alcoholism and Substance Abuse

In 2004, four years prior to her alleged onset date, Claimant participated in a treatment program at the South Suburban Council on Alcoholism and Substance Abuse due to alcohol and cocaine use. *Id.* at 291-417. These records note Claimant's prior diagnoses of bipolar disorder and ADHD as a child. *Id.* at 346, 355-57.

#### 2. Oak Forest Hospital Emergency Room

In August 2007, Claimant presented at the Oak Forest Hospital emergency room complaining of low back and pelvic pain. *Id.* at. 428. Claimant was ten weeks pregnant and had

been taking Aleve and drinking alcohol to ease her pain. *Id.* at 431. Claimant was released and told to take Tylenol. *Id.* at 436.

On November 16, 2008, Claimant presented at the Oak Forest Hospital emergency room with coughing for two to three weeks. *Id.* at 470. A chest x-ray was normal, but she had positive lab results for cocaine. *Id.* at 482, 485.

### 3. Tinley Park Mental Health Center

In May 2008, Claimant presented at the Oak Forest Hospital emergency room because she started using alcohol and cocaine again after being clean for two months. *Id.* at 437. Shortly thereafter she was transferred to Tinley Park Mental Health Center. *Id.* at 419-21. She was disheveled and restless at the time of admission, had a depressed mood, and her affect was anxious, restless, and irritable. *Id.* However, she was alert and appropriately dressed. She was oriented to time, place, and person. *Id.* She reported having a suicidal ideation in January 2008 while under the influence of drugs and alcohol, but denied any current suicidal or homicidal ideations. *Id.* Her memory was not impaired, her cognition and comprehension were intact, and her judgment and insight were fair. *Id.* Her provisional diagnoses were bipolar disorder, polysubstance dependence (alcohol and cocaine), and a GAF of 20. *Id.*

Claimant denied having major medical problems and improved when she resumed her medication. *Id.* She was placed on frequent observation for twenty-four hours and was discharged without incident. *Id.* Upon discharge, Claimant's prognosis was good, as long as she continued her medication and abstained from drugs and alcohol. *Id.* at 421. Her GAF had improved to 64, indicating only mild symptoms. *Id.*

### 4. Dr. Paul Carter, Aunt Martha's Youth Service Center

On August 12, 2010, Claimant sought treatment at Aunt Martha's Youth Service Center to restart medication for bipolar disorder. *Id.* at 503. Claimant indicated that her left hand hurt from a birth defect and that her stomach bothered her. *Id.* She denied any hallucination or suicidal plans. *Id.* She reported that she last took psychotropic medications one year ago. *Id.* Her physical examination findings were within normal limits other than her left hand deformity. *Id.* at 502. Claimant was referred for a psychiatric evaluation. *Id.*

On September 15, 2010, Claimant presented for her initial psychiatric examination with Dr. Paul Carter at Aunt Martha's. *Id.* at 597. During her initial evaluation with Dr. Carter, Claimant was cooperative with good eye contact; had an "OK" mood and normal psychomotor status; her affect was euthymic, full, reactive and appropriate, with normal intensity; her thought process was linear, goal directed, and organized; and she had fair insight and low impulsivity. *Id.* at 598. Her symptoms included irritability, rapid mood changes, pressured thoughts, insomnia, and general anxiety. *Id.* at 598. Dr. Carter noted diagnoses of bipolar disorder, ADHD, and anxiety disorder. *Id.* at 599. Following the initial examination, Claimant resumed use of her bipolar medication, Sepharis, and was stable over the next few months. *Id.* at 592-96.

Claimant continued treatment with Dr. Carter through 2011 and reported that her medications "seem[ed] to be helping." *Id.* at 611. Her medications were adjusted in March when she began to have some ADHD symptoms, and in the next few months, she had a good, stable mood and her symptoms were "much improved." *Id.* at 610-11. Claimant stayed on the same medications through early 2012 without side effects, and her mental status findings showed cooperation; normal psychomotor activity; euthymic affect that was full of normal intensity, appropriate, and reactive; linear, goal directed, and organized thought process; fair insight and judgment; and low impulsivity. *Id.* at 627.

Dr. Carter completed a Mental Medical Source Statement in April 2012, in which he opined that Claimant would find making decisions, exercising independent judgment, and completing tasks stressful, but stated he was "unable to assess" Claimant's ability to perform work-related activities because she was not working at the time. *Id.* 635-37. Dr. Carter indicated, however, that Claimant had a good prognosis, and with treatment had a stable mood, no depression or mania, and partially improved ADHD symptoms. *Id.* He further explained Claimant's symptoms were "much improved with medication" and assigned Claimant a GAF of 60, indicating moderate symptoms. *Id.*

Claimant also intermittently reported various physical ailments throughout her treatment at Aunt Martha's, including both acute and ongoing pain in her limb in August 2010, left hand deformity and pain in January 2011, 7/10 pain in her left hand due to arthritis in May 2011, and 6/10 left hand pain in December 2011. *Id.* at 502, 521, 609, 629.

### DDS Physicians

#### 1.    Dr. M.S. Patil

Dr. Patil performed an internal medicine consultative examination for the Bureau of Disability Determination Services on October 20, 2010. R. 537. Claimant complained of mild to moderate difficulty grasping pots and pans, carrying buckets and pushing with her left hand. *Id.* Claimant also complained of mild pain and stiffness in her right hand, especially in the mornings. *Id.* Claimant further complained of pain in her back, hips and knees, stating: "I have been told I have arthritis." *Id.* Claimant was not taking pain medication and denied any other medical ailments. *Id.* Dr. Patil noted that Claimant was 60 inches in height and 157 pounds. R. 30. Her speech and gait were normal. *Id.* Her back and spine had no obvious deformities and

no paravertebral tenderness or spasms. *Id.* There were no limitations in range of motion in her back and spine. *Id.*

Physically, Dr. Patil diagnosed Claimant with a mild congenital deformity of the left hand and fingers, left hand with four fingers, one surgery on the right hand, three surgeries on the left hand, a history of arthritis, and a history of GERD. R. 540. Dr. Patil examined the fine and gross manipulative movements of Claimant's hands and fingers, and found that Claimant had moderate difficulties in using her left hand and no difficulties in using her dominant right hand. R. 539. Claimant's grip strength was 5/5 with her right hand and 3/5 with her left hand. *Id.*

Mentally, Dr. Patil diagnosed Claimant with a history of manic depression, bipolar disorder, anxiety, and trouble sleeping. *Id.* Dr. Patil noted that Claimant's mentation and memory were normal at the time of the examination. *Id.* Dr. Patil noted that six weeks prior, Claimant began taking Saphris for bipolar disorder, and Claimant stated that the medication helps her considerably. *Id.* Claimant denied hearing voices or having suicidal feelings or plans. *Id.* Claimant denied chronic substance abuse. *Id.* Dr. Patil found Claimant to have fair attention and concentration, fair judgment and insight, and fair intellectual functioning. *Id.*

### 2. Dr. Gregory Rudolph

Dr. Gregory Rudolph, a licensed clinical psychologist, performed a mental status evaluation for the Bureau of Disability Determination Services on October 21, 2010. *Id.* at 541-45. Claimant reported symptoms of depression and manic phases to Dr. Rudolph, but stated she could take care of her basic needs and perform household chores at her own pace to accommodate the pain in her right arm. *Id.* at 541. She complained of problems with reading and reading comprehension. *Id.* at 542. She reported a history of alcohol dependence, cocaine use, and physical and sexual abuse. *Id.* at 542-43.

Claimant presented with vegetative symptoms and her mood level was subdued and depressed. *Id.* at 541. But she was alert and oriented to reality, and she had intact memory skills, good knowledge of information, adequate judgment and reasoning skills, and relevant and coherent thoughts. *Id.* at 541-44. Dr. Rudolph diagnosed Claimant with bipolar disorder with mood swings, PTSD, physical and sexual abuse, alcohol and cocaine abuse in remission, and ADHD as a child. *Id.* at 541. He opined that Claimant is capable of managing her own finances but that her prognosis and insight are limited. *Id.* He also noted from Claimant's medical history a left hand deformity from a birth defect, back pain, arthritis in the right elbow, and carpal tunnel syndrome with release surgery. *Id.*

### 3. Howard Tin, Psy.D.

Dr. Howard Tin, a state agency reviewer, completed a Mental Residual Functional Capacity Assessment on November 10, 2010. *Id.* at 585-88. Dr. Tin found Claimant to be "moderately" limited in her ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances. *Id.* at 585. He found that Claimant was not significantly limited in her ability to sustain an ordinary routine without special supervision, to complete a normal workday or workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 585-86.

In addition, Dr. Tin opined that Claimant did not have any mental limitations in a number of areas. For example, he found that Claimant had no limitation in her ability to remember locations and work-like procedures; to understand, remember, and carry out short and simple instructions; to carry out detailed instructions; to work in coordination with or proximity to

others without being distracted; to make simple work-related decisions; or to respond appropriately to changes in the work setting. *Id.*

Dr. Tin also addressed Claimant's capacity for social interactions. He found there was no evidence Claimant was limited in her ability to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or to maintain socially appropriate behavior. *Id.* at 586. He further opined Claimant was not significantly limited in her ability to ask simple questions or request assistance, or to accept instructions and respond appropriately to criticism from superiors. *Id.*

Dr. Tin noted Claimant's diagnoses of bipolar disorder, PTSD, polysubstance dependence (cocaine and alcohol), history of ADHD, and history of physical and sexual abuse. *Id.* at 587. He noted Claimant was somber and depressed during the examination and had difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time. *Id.* He concluded, however, that Claimant was capable of understanding, remembering, and performing simple tasks, and that she was capable of interacting appropriately with the general public, asking simple questions and accepting instructions, appropriately responding to criticism, working with others, and maintaining socially appropriate behavior. *Id.*

### 4. Dr. Charles Kenney

Dr. Charles Kenney completed a Physical Residual Functional Capacity assessment on November 12, 2010. *Id.* at 577-584. Dr. Kenney noted Claimant's primary diagnosis of left hand deformity and secondary diagnosis of arthritis. *Id.* at 577. He opined that Claimant could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit about six hours

in an eight-hour workday. *Id.* at 578. She could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and frequently balance, stoop, kneel, crouch, and crawl. *Id.* at 579. Dr. Kenney imposed no environmental limitations on Claimant. *Id.* at 581.

Dr. Kenney found Claimant's ability to push and/or pull was limited in the upper extremities due to the congenital deformity in her left hand. *Id.* at 578. Dr. Kenney noted "moderate difficulty" in fine and gross manipulative movements of the left hand and found Claimant's ability to handle and finger with the left hand to be limited. *Id.* at 580. Her left hand grip strength was 3/5. *Id.* Dr. Kenney found, however, that Claimant had a normal gait and full range of motion in all joints, and she was unlimited in reaching in all directions. *Id.* at 578-80.

**D.     The ALJ's Decision**

The ALJ issued a written decision on May 25, 2012, finding Claimant not disabled under the Social Security Act. *Id.* at 36. At step one of the required five-step sequential evaluation process, the ALJ found Claimant had not engaged in substantial gainful activity since her alleged disability onset date of May 1, 2008. *Id.* at 23. At step two, the ALJ found Claimant had the severe impairments of deformity of the left hand with arthritis and no second left finger, degenerative joint disease of the fourth and fifth fingers of the left hand, depression disorder, ADHD, anxiety disorder, history of carpal tunnel syndrome, and history of substance abuse and bipolar disorder. *Id.* At step three, the ALJ determined Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). *Id.* at 23-24.

The ALJ determined that Claimant had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional climbing of ramps or stairs but no climbing

of ladder, ropes or scaffolds; frequent fingering and handling with her right upper extremity; never reaching overhead with right upper extremity; no use of the left non-dominant hand; and unskilled simple, routine and repetitive work and not fast paced in nature. *Id.* at 26. The ALJ reasoned that the RFC was appropriate because no greater or additional limitations were justified by the medical evidence and Claimant's complaints were not entirely credible. At step four, the ALJ found that Claimant is unable to perform any past relevant work. *Id.* at 34. At step five, the ALJ found there were jobs existing in significant numbers in the national economy that Claimant could perform. *Id.* Accordingly, the ALJ concluded Claimant was not disabled under the Social Security Act.

The Social Security Appeals Council denied Claimant's request for review on August 30, 2013 (R 1-3), making the ALJ's opinion the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Claimant seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Baumhart,* 416 F.3d 621, 626 (7th Cir. 2005).

## II. LEGAL STANDARD

### A.      Standard of Review

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A "mere

scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even

when there is adequate evidence in the record to support the decision, however, the findings will

not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the

conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's

decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano

v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is

deferential, a reviewing court must "conduct a critical review of the evidence" before affirming

the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may

not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making

independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Thus, judicial review is limited to determining whether the ALJ applied the correct legal

standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at

1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the

decision of the [Commissioner], with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g).

**B.**     **Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a

"disability" as defined in the Social Security Act.[2] *Liskowitz v. Astrue*, 559 F.3d 736, 739-40

---

[2] The standard for determining "disability" for SSI is "virtually identical" to that used for disability insurance
benefits ("DIB"). *Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674
n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the
process of evaluation are identical in all respects relevant to this case."); *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007); *Knipe v. Heckler*, 755 F.2d 141, 145 n.8 (10th Cir. 1985). Accordingly, this Court cites to both SSI and
DIB cases.

(7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

Claimant proffers the following arguments in support of her motion for summary judgment: (1) the ALJ erred by relying on gaps in Claimant's treatment history in assessing her credibility and residual function capacity; (2) the ALJ erred in crediting some, but not all, of Claimant's testimony in order to give Claimant "the benefit of the doubt"; and (3) the ALJ erred in failing to consider Claimant's mild difficulties in social functioning in her RFC analysis. Claimant's arguments essentially boil down to two issues: whether the ALJ's RFC determination

is supported by substantial evidence and whether the ALJ's credibility determination is patently wrong. The Court reviews each of these issues below and finds that remand is not warranted.

## A. Substantial evidence supports the ALJ's RFC determination.

Claimant argues that the ALJ committed multiple harmful errors in computing her RFC and, therefore, the case must be remanded. The Court disagrees. A claimant's RFC is an assessment of what work-related activities a claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In computing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.d 558, 563 (7th Cit. 2009); *see also* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 (The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."). The ALJ's RFC finding must be supported by substantial evidence, and a reviewing court must be able to trace the path of the ALJ's reasoning behind the RFC finding. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

Here, the ALJ determined that Claimant had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Claimant could only occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds; could frequently finger and handle with the right upper extremity; could never reach overhead with the right upper extremity; and had no use of her non-dominant left hand. R. 26. The ALJ further limited Claimant to unskilled, simple, routine, and repetitive work that was not fast-paced in nature to accommodate Claimant's mental impairments. *Id.*

In reaching her RFC determination as to Claimant's physical impairments, the ALJ gave considerable weight to the opinion of Dr. Kenney, the state agency consultant, who opined that Claimant was capable of light work. R. 32. As set forth above, Dr. Kenney noted Claimant's left hand deformity limited her ability to handle and finger, and the ALJ's RFC accommodates those limitations by specifying that Claimant is restricted to light work and cannot use her left hand at all. The ALJ also gave great weight to the opinion of Dr. Jilhewar, the medical expert, who testified at the administrative hearing that Claimant was capable of light work with minimal to no use of the non-dominant left hand. *Id.* Again, the ALJ's RFC accommodates those limitations by limiting Claimant to light work with no use of her left hand.

As to Claimant's mental limitations, the ALJ gave great weight to the opinion of Dr. Tin, who, as mentioned above, noted some limitations in Claimant's ability to understand detailed instructions and maintain attention and concentration for extended periods of time. *Id.* Dr. Tin also found, however, that Claimant was capable of performing simple tasks, executing short instructions, and interacting with coworkers and the general public. The ALJ's RFC assessment accounts for these limitations by limiting Claimant to unskilled, simple, routine, and repetitive work. The ALJ also gave some weight to Dr. Carter, Claimant's treating psychiatrist, even though Dr. Carter indicated Claimant had a good prognosis. R. 33-34.

The ALJ was entitled to rely on the opinions of the medical expert and the state agency consultants in computing Claimant's RFC. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (the ALJ properly relied on the medical expert's testimony, which was consistent with the state agency medical consultant's findings, in computing claimant's RFC); *see also* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency medical consultants are "highly qualified" experts in Social Security disability evaluations). Notably, Claimant does not argue otherwise,

nor does she argue the ALJ ought to have relied on different medical sources in determining her RFC. Claimant also fails to point to evidence from any medical source suggesting she is more limited than the ALJ found her to be.

Instead, Claimant first argues that the ALJ's RFC assessment cannot stand because the ALJ improperly relied on gaps on Claimant's treatment to determine that Claimant is not as impaired as she alleges. Infrequent treatment or a failure to follow a treatment plan can support an adverse credibility finding where a claimant does not have a good explanation for the failure or infrequency of treatment. *Craft v. Astrue*, 539 F.3d 668, 679. But an ALJ cannot draw any inferences from this failure unless the ALJ has explored the claimant's explanations as to the lack of treatment. *Id.* An inability to afford treatment may shed some light on a claimant's credibility. *Id.*

Here, Claimant argues that she did not seek consistent treatment because she had no medical insurance or income. ECF No. 12. The medical expert also testified that Claimant's lack of consistent treatment appeared to be due to a lack of insurance and, in fact, the record contains a note explaining that Claimant could not receive treatment at Ingalls Hospital for that very reason. R. 75, 374. In response, the Commissioner emphasizes the ALJ's findings that Claimant's sporadic hospital visits demonstrate she was capable of receiving treatment when necessary, and that Claimant knew she could receive free medical services at Stroger Hospital and Fantus Clinic but opted not to. ECF No. 17 at 9-10.

The Court need not get to the merits of the parties' arguments, because even if the ALJ erred in considering Claimant's lack of treatment in assessing her RFC, any such error is harmless. The ALJ's RFC assessment does not rise and fall on a dearth of treatment records. Rather, the ALJ articulated other reasons, independent of Claimant's treatment hiatus, to

determine what work-related activities Claimant was capable of performing, citing the findings

of the medical expert, state agency consultants, and even Claimant's own treating physician.

Claimant does not argue that these findings are wrong or incomplete. She does not take issue

with the ALJ's reliance on the medical expert and state agency physicians in calculating her

RFC. Nor does she take issue with either the methods employed by, or the findings of, those

physicians in evaluating her impairments. In short, the ALJ's RFC finding is supported by

substantial evidence, and Claimant has pointed to nothing in the record suggesting she is more

limited than the ALJ assessed her to be.

Rather, Claimant's argument is that the ALJ should not have considered her lack of

treatment at all. But Claimant does not explain how the ALJ's consideration of her lack of

treatment in any way influenced the RFC assessment. In fact, the ALJ noted that despite a gap in

treatment, Claimant's symptoms remained stable, suggesting that the treatment gap had no

impact whatsoever on Claimant's impairments. R. 29. Claimant does not dispute this finding.

Accordingly, even if the ALJ did err in referencing Claimant's gap in treatment in her RFC

analysis, any such error is harmless and does not warrant remand. *See Pulli v. Astrue*, 643

F.Supp.2d 1062, 1075 (N.D. Ill. 2009) (finding remand inappropriate where the ALJ's credibility

determination did not rest on the claimant's lack of treatment alone); *Hoffman v. Barnhart*, 2005

WL 66049, at *16 (N.D. Ill. Jan. 12, 2005) (declining to remand where the claimant's lack of

treatment was merely an additional factor in the ALJ's credibility assessment).

Claimant also argues the ALJ erred in assessing her RFC by failing to factor in her mild

mental limitations. Specifically, Claimant argues that the ALJ found Claimant had mild

difficulties in social functioning at Step 2 of the sequential evaluation process, but did not

address those mild difficulties in her discussion of Claimant's RFC at Steps 4 and 5. ECF No. 12 at 12-13. The Court cannot agree with Claimant's reading of the ALJ's opinion.

The limitations identified in the "paragraph B" and "paragraph C" criteria at Steps 2 and 3 of the sequential evaluation process are not an RFC assessment. SSR 96-8p. The RFC assessment requires "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C." *Id.* That is precisely what the ALJ did in her opinion. While the ALJ found "mild difficulties" in social functioning at Step 2, she expanded on those findings in assessing Claimant's RFC, explaining that, despite some limitations, Claimant was nevertheless capable of interacting with the general public, responding appropriately to supervisors, and appropriately working with others. R. 33. She cited Dr. Tin's evaluation as the basis for her conclusions, and, as previously stated, Claimant does not take issue with the ALJ's reliance on Dr. Tin.

Claimant's argument is semantic rather than substantive. There is no requirement that the ALJ include the same language in Sections 4 and 5 of her opinion that she employed in Section 2. Moreover, Claimant selectively quotes the ALJ's opinion in order to make the argument that the ALJ found Claimant did not have "any limitation" in social functioning at Steps 4 and 5, while inconsistently finding at Step 2 that Claimant had "mild limitations" in that area. ECF No. 12 at 13. The ALJ never stated at Steps 4 and 5 that Claimant had no limitations in social functioning. Rather, the ALJ found that the record did not support any problems that would warrant the limitations Claimant's attorney advocated at the administrative hearing – namely, limitations with the general public and limitations with concentration, persistence, and pace. R. 33 ("I do not find that the record supports any problems with getting along with others to warrant any limitation as counsel[ ] alleged at the hearing."). In analyzing the ALJ's opinion, the Court

gives it "a commonsensical reading rather than nitpicking at it" for flaws or inconsistencies. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). A commonsensical reading of the ALJ's opinion illustrates that she plainly addressed Claimant's mild limitations in social functioning in determining Claimant's RFC, but ultimately determined that any such limitations did not preclude Claimant from working.

Claimant's last argument in support of remand on the basis of an erroneous RFC determination is that the ALJ erred in arbitrarily crediting some of Claimant's testimony, but not all of it. The Court addresses this argument below.

**B.     The ALJ's credibility determination was not patently wrong.**

Claimant also raises a number of arguments contending the ALJ's erroneous credibility determination warrants remand. The ALJ is in the best position to observe witnesses, and the Court will not disturb her credibility determinations as long as they find some support in the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). It is well settled the Court will only reverse the ALJ's credibility determination if a claimant can show it was "patently wrong." *Id.* Claimant has not done so here.

Claimant first argues that the ALJ erred by relying on Claimant's gap in treatment in determining she was not entirely credible. This is the same argument Claimant raised regarding the ALJ's RFC determination, discussed above in Part A. Here, too, Claimant's gap in treatment was merely one factor the ALJ considered in determining Claimant was not wholly credible. But the ALJ cited other reasons for her credibility finding as well, including properly relying on objective medical evidence that contradicted Claimant's testimony. *See Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (explaining that "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record"). The ALJ noted, for

example, that the limited medical records documenting Claimant's alleged physical impairments did not support any treatment other than a few office visits for Claimant's left hand, with no mention of any problems in her right upper extremity. R. 31. The ALJ further noted Claimant had no difficulty with using her right hand at a consultative examination. R. 30. These findings contradict Claimant's testimony about difficulties with her right upper extremity.

Regarding Claimant's mental limitations, the ALJ emphasized that Claimant's symptoms improved after receiving treatment. R. 31-32. The ALJ also pointed out Claimant's mental health symptoms were stable and generally controlled by medications, and cited Dr. Tin's findings that Claimant was capable of appropriately interacting with the general public. R. 31. Notably, Claimant does not dispute any of these findings, which contradict Claimant's testimony that she cannot interact well with others. The ALJ offered adequate reasons for disbelieving portions of Claimant's testimony, and the Court cannot say her credibility determination was "patently wrong." *Pulli*, 643 F.Supp.2d at 1075 (finding remand inappropriate where the ALJ's credibility determination did not rest on the claimant's lack of treatment alone); *Hoffmant*, 2005 WL 66049, at *16 (declining to remand where the claimant's lack of treatment was merely an additional factor in the ALJ's credibility assessment).

Claimant next argues that ALJ erred in arbitrarily crediting some of Claimant's testimony, but not all of it. Claimant raises this argument in relation to the ALJ's RFC assessment, as well. The analysis is the same for both arguments, because even if the ALJ did err in giving Claimant the "benefit of the doubt," which the Court declines to find at this point, any error in doing so is harmless. Claimant's argument to the contrary (ECF No. 18 at 8) is without merit. Claimant essentially argues that, if the ALJ was going to credit some of her testimony, she was required to credit all of it. As explained throughout this Memorandum

Opinion and Order, however, the ALJ's RFC determination and credibility analysis are supported by substantial evidence. The ALJ properly relied on objective medical evidence from the medical expert, state agency physicians, and even Claimant's treating physicians, none of whom opined Claimant was more limited than the ALJ found her to be. That the ALJ nevertheless imposed more restrictions on Claimant than any medical professional found warranted could only benefit Claimant.

### III. CONCLUSION

For the reasons set forth above, Claimant's Motion for Summary Judgment (ECF No. 12) is denied. The Commissioner's cross motion for summary judgment (ECF No. 16) is granted, and the Commissioner's decision denying Claimant's application for disability benefits is affirmed.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: March 29, 2016